| | |
|---|---|
| WILLIAM S. WOLLESEN, IOWA PLAINS FARMS, KRISTI J. WOLLESEN, AND JOHN W. WOLLESEN,<br><br>Plaintiffs,<br><br>v.<br><br>WEST CENTRAL COOPERATIVE, JEFFREY B. STROBURG, SUSAN TRONCHETTI, DARRELL JENSEN, CHRISTOPHER S. COEN, CRAIG HEINEMAN, JAY DREES, ROGER GINDER, JAMES CARLSON, DARYL DOERDER, DELBERT CHRISTENSEN, GLEN CHRISTENSEN, SAM SPELLMAN, DANIEL HELLER, SCOTT B. CHESNUT, HARRY A. AHRENHOLTZ, LINDA BUSS, TIMOTHY WEIGEL, DAWN THIELEN, WESTCO AGRONOMY COMPANY, LLC, WIXTED, INC., D/B/A WIXTED POPE NORA THOMPSON, WIXTED POPE NORA THOMPSON & ASSOCIATES, LLC, EILEEN WIXTED, GARDINER THOMSEN P.C., DANIEL MARK GARDINER, AND MILAN KUCERAK<br><br>Defendants. | Case No. 5:16-cv-4012<br><br>**VERIFIED COMPLAINT AND JURY DEMAND** |

Plaintiffs William S. Wollesen, Iowa Plains Farms, Kristi J. Wollesen, and John W. Wollesen (collectively, the "Wollesens"), by and through their attorneys, bring this action against Jeffrey B. Stroburg, Susan Tronchetti, Darrell Jensen, Christopher S. Coen, Craig Heineman, Jay Drees, Roger Ginder, James Carlson, Daryl Doerder, Delbert Christensen, Glen Christensen, Darrell Jensen, Sam Spellman, Daniel Heller, Harry A. Ahrenholtz, Timothy Weigel, Linda Buss, Dawn M. Thielen and Scott P. Chesnut (collectively, the "Officers and Directors"), Milan Kucerak, Westco Agronomy Company, LLC ("Westco"), West Central

Cooperative (collectively, with Westco, "West Central"), Wixted, Inc. d/b/a Wixted Pope Nora Thompson, Wixted Pope Nora Thompson & Associates, LLC, Eileen Wixted (Wixted, Inc., Wixted Pope Nora Thompson & Associates, LLC, and Eileen Wixted are referred to collectively herein as "Wixted Pope"), Gardiner Thomsen P.C., Timothy Weigel, and Daniel Mark Gardiner (Gardiner Thomsen, P.C., Timothy Weigel, and Daniel Mark Gardiner are referred to collectively as "Gardiner Thomsen"). The Wollesens allege, on information and belief, except for information based on personal knowledge, as follows:

**PARTIES**

1.  Iowa Plains Farms is a partnership organized under the laws of Iowa, with its principal place of business located in Sac County, Iowa.

2.  William S. Wollesen, Kristi J. Wollesen and John W. Wollesen, individuals who reside in Sac County, Iowa are the general partners of Iowa Plains Farms.

3.  West Central Cooperative is an Iowa cooperative organized under Iowa Code Chapter 499, with its principal place of business located in Ralston, Iowa.

4.  Westco is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Ralston, Iowa.

5.  Jeffrey B. Stroburg ("Stroburg") is an individual who resides in Chesterfield County, Virginia. Stroburg became the Chief Executive Officer ("CEO") of West Central Cooperative in 1999, and he held the position until January 31, 2015. From February 1, 2006 until his departure, Stroburg was leased to Westco and also served as an officer of Westco.

6.  Susan Tronchetti ("Tronchetti") is an individual who resides in Greene County, Iowa. Tronchetti was a member of West Central Cooperative's board of directors and its audit

committee during the period of time relevant to this action. Tronchetti presently is the Chairperson of West Central Cooperative's board of directors.

7. Craig Heineman ("Heineman") is an individual who resides in Boone County, Iowa. Heineman is a member of West Central Cooperative's board of directors and was a member of the board of directors during the period of time relevant to this action.

8. Jay Drees ("Drees") is an individual who resides in Carroll County, Iowa. Drees is a member of West Central Cooperative's board of directors and was a member of the board of directors during the period of time relevant to this action.

9. Roger Ginder ("Ginder") is an individual who resides in Story County, Iowa. Ginder was a member of West Central Cooperative's board of directors and its audit committee during the period of time at issue in this action.

10. James Carlson ("Carlson") is an individual who resides in Webster County, Iowa. Carlson is a member of West Central Cooperative's board of directors and was a member of the board of directors during the period of time relevant to this action.

11. Daryl Doerder ("Doerder") is an individual who resides in Boone County, Iowa. Doerder is a member of West Central Cooperative's board of directors and was a member of the board of directors during the period of time relevant to this action.

12. Delbert Christensen ("Christensen") is an individual who resides in Audobon County, Iowa. Christensen was a member of West Central Cooperative's board of directors during the period of time at issue in this action.

13. Glen Christensen ("Christensen") is an individual who resides in Greene County, Iowa. Christensen is a member of West Central Cooperative's board of directors and was a member of the board of directors during the period of time relevant to this action.

14.     Sam Spellman ("Spellman") is an individual who resides in Dallas County, Iowa. Spellman is a member of West Central Cooperative's board of director and was a member of the board of directors during the period of time relevant to this action.

15.     Daniel Heller ("Heller") is an individual who resides in Shelby County, Iowa. Heller is a member of West Central Cooperative's board of directors and was a member of the board of directors during the period of time relevant to this action.

16.     Scott P. Chesnut ("Chesnut") is an individual who resides in Boone County, Iowa. Chesnut was a member of the board of directors of West Central Cooperative and its audit committee during the period from July 2003 to June 2010 (Tronchetti, Ginder and Chesnut are referred to collectively herein as the "Audit Committee").

17.     Darrell Jensen ("Jensen") is an individual who resides in Guthrie County, Iowa. Jensen is a member of West Central Cooperative's board of directors and was a member of the board of directors during the period of time relevant to this action.

18.     Christopher Coen ("Coen") is an individual who resides in Jackson County, Missouri. Coen served as the Chief Information Officer ("CIO") and head accountant for West Central Cooperative for the period 2008 through 2011. In the summer of 2011, Coen was asked to, and did, tender his resignation.

19.     Harry A. Ahrenholtz ("Ahrenholtz") is an individual who resides in Greene County, Iowa. For the period from 2001 until June 2011, when he was demoted, Ahrenholtz was an employee of West Central Cooperative and the most-senior executive of West Central's agronomy division. From February 1, 2006 through August 2011, Ahrenholtz was leased to Westco and served an officer of Westco. In September 2011, at the request of the remaining Officers and Directors, Ahrenholtz resigned from West Central.

20.     Timothy Weigel ("Weigel") is an individual who resides in Polk County, Iowa. For the period of time at issue, Weigel served as an outside auditor for West Central and subsequently Westco's chief internal accountant.

21.     Linda Buss ("Buss") is an individual who resides in Carroll County, Iowa. For the period of time at issue, Buss served as an officer of West Central Cooperative.

22.     Dawn M. Thielen ("Thielen") is an individual who resides in Greene County, Iowa. For the period of time at issue, Thielen served as West Central Cooperative's internal auditor. In that position, Thielen reported directly to Stroburg.

23.     Each of the Officers and Directors was authorized to, and did, approve and take corporate action on behalf of Westco in their positions as officers or directors of West Central Cooperative.

24.     Upon information and belief, each of the Officers and Directors (other than Chesnut) approved the filing and prosecution of the lawsuit by Westco against the Wollesens, ⸺Case No. LACV046817 (Story County, Iowa) that was filed on or about May 12, 2011 (the "Lawsuit")⸺in their fiduciary capacities for West Central Cooperative and Westco.

25.     Milan Kucerak ("Kucerak") is an individual who, upon information and belief, resides in Greene County, Iowa.

26.     Eileen Wixted ("Wixted") is an individual who, upon information and belief, resides in Polk County, Iowa.

27.     Wixted, Inc. d/b/a Wixted Pope Nora Thompson is an Iowa corporation with its principal place of business located in Polk County, Iowa.

28.     Wixted Pope Nora Thompson & Associates, LLC is an Iowa corporation with its principal place of business located in Polk County, Iowa.

29.     Wixted Pope describes and markets Wixted as, among other things, "a strategic communication and crisis management veteran with extensive experience in energy and healthcare.  She has helped clients manage brand damaging issues, and prepare for hostile media interviews, shareholder meetings, financial presentations, and government investigations."

30.     Gardiner Thomsen, P.C. is an Iowa professional corporation with its headquarters located in Polk County, Iowa.  According to Gardiner Thomsen, P.C.'s website, "[w]hen you work with Gardiner Thomsen, you enter into a partnership that is invested in mutual success. Let's work together."  *See* https://gardinercpa.com/services/.

31.     Daniel Mark Gardiner ("Mark Gardiner") is an individual who, upon information and belief, resides in Dallas County, Iowa.

32.     Mark Gardiner is a certified public accountant, certified fraud examiner, partner of Gardiner Thomsen, P.C., and member of the Iowa Society of CPAs, American Institute of CPAs, Association of Certified Fraud Examiners and the National Society of Accountants for Cooperatives.  Mark Gardiner works for Gardiner Thomsen, P.C. from its headquarters in Des Moines, Iowa.

33.     According to Gardiner Thomsen, P.C.'s website, Mark Gardiner: "specializes in ag-related businesses, especially farmer cooperatives.  He is motivated by the opportunity to assist clients with their accounting and auditing needs."  *See* http://gardinercpa.com/about/staff/daniel-mark-gardiner-cpa-partner/

34.     West Central is required to submit annual financial statements that are audited in conformity with GAAP, accompanied by an unqualified audit opinion, to both the state of Iowa and the Federal Government.  West Central's audited financial statements are transmitted across state lines, using the mails and/or wires.

35. GAAP requires that an independent auditor obtain written representations from management as a part of an audit of financial statements.

36. The written representations from management must include: (i) knowledge of fraud or suspected fraud affecting the entity involving: (a) management, (b) employees who have significant roles in internal control, or (c) others where the fraud could have a material effect on the financial statements; and (ii) knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators, short sellers, or others.

37. The written representations identified in the preceding paragraph must be made as of the date of the auditor's report. Any refusal by management to furnish written representations constitutes a limitation on the scope of the audit sufficient to preclude an unqualified opinion and is ordinarily sufficient to cause an auditor to disclaim an opinion or withdraw from the engagement.

38. Gardiner Thomsen, P.C. has served as West Central's auditor since 1964. Gardiner Thomsen, P.C. also has offered other accounting and consulting services to West Central. For each of the years at issue in this action, Mark Gardiner served as the lead engagement partner for Gardiner Thomsen, P.C.'s professional work for West Central Cooperative and Westco. Gardiner Thomsen, P.C. continues to serve as West Central's auditor for those and other entities.

39. West Central has paid millions of dollars in fees to Gardiner Thomsen, P.C. for its services over the years, including during the period of time at issue in this Action. Gardiner Thomsen, P.C. also performs services for other entities for which individual Defendants hold position, including First Cooperative Association, of which Carlson is the General Manager.

West Central's decision to retain Gardiner Thomsen, P.C. for the period of time at issue was made by the Audit Committee.

40.     Farmers Cooperative Company is an Iowa cooperative organized under Iowa Code Chapter 499, with its principal place of business located in Ames, Iowa.

41.     On December 18, 2015, members of Farmers Cooperative Company and West Central Cooperative voted to merge West Central Cooperative into Farmers Cooperative Company. The Officers and Directors failed to provide sufficient and necessary information to West Central's members for purposes of their votes on the anticipated merger.

42.     It is anticipate that on or about April 1, 2016, West Central Cooperative will be merged into Farmers Cooperative Company, with Farmers Cooperative Company to survive and be known as Landus Cooperative, with its primary place of business located in Ames, Iowa.

43.     Following the merger identified in the preceding paragraph, Farmers Cooperative Company will assume and become responsible for all pre-exiting claims against West Central Cooperative and Westco, including the claims that are at issue in this Action.

## JURISDICTION AND VENUE

44.     This Court has jurisdiction to hear this action under 28 U.S. Code § 1331, because the action arises under the laws of the United States.

45.     Venue is appropriate under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred in this within this judicial district and certain Defendants reside within this judicial district.

## FACTUAL BACKGROUND

### A.     West Central Hires Stroburg and Hartzler.

46.     In 1999, West Central Cooperative hired Stroburg to serve as is its CEO. One of Stroburg's goals was to expand West Central's minimal presence in the agronomy industry.

47.     On September 25, 2001, an agronomy account was established for Iowa Plains Farms at West Central.  Stroburg, who wanted to target large farmers, personally requested that the account be established.

48.     On October 5, 2001, West Central sent a credit application to Iowa Plains Farms, which, if approved, would have allowed Iowa Plains Farms to purchase agronomy products on credit.  Iowa Plains Farms did not return the application, because it did not intend to purchase any products from West Central on credit.

49.     In February 2002, Iowa Plains Farms began purchasing agronomy products from West Central on a prepay basis through Eric Clark, the agronomist assigned to its account.

50.     In the spring of 2002, Iowa Plains Farms declined credit privileges and told West Central's Credit Manager that Iowa Plain Farms intended to prepay for its purchases.

51.     In July 2002, West Central Cooperative hired Hartzler to serve as its Seed Sales Marketing Manager.  West Central Cooperative hired Hartzler to increase West Central's sales and to improve its competitive position in the agronomy industry.

52.     Hartzler was an employee of West Central Cooperative at all times from July 2002 until April 30, 2011.  During that entire period, Hartzler reported to Ahrenholtz, the head of agronomy for West Central, who reported to Stroburg.

53.     West Central marketed Hartzler as serving in a specialized role for his assigned customers.  For example, and without limitation, West Central described Hartzler on its website and elsewhere as being charged with, among other things, developing specialized product programs.

54.     Hartzler was given virtually unlimited authority and discretion to grow West Central's agronomy business, with insufficient controls or oversight.  Hartzler was allowed to

and did, among other things: (i) set retail prices for seed & chemicals; (ii) approve "free seed" for customers (*i.e.*, seed given to customers for promotional or other sales purposes); (iii) make sales; (iv) enter into prepayment contracts with customers; (v) enter prepayment contracts into West Central's systems; (vi) approve price exceptions for seed and chemicals; (g) make sales entries into West Central's accounting systems; (vii) collect payments from customers; (viii) retain checks from customers for prolonged periods; (ix) apply payments from customers to accounts; (x) negotiate rebate programs with suppliers; and (xi) determine the amount of money that West Central accrued each year for rebates that had not been paid.

55. When calling on customers, Hartzler described himself as "the dealmaker" for West Central, and he told them that deals far above West Central's published price schedule "really started" if they purchased more than $1 million annually from West Central.

56. Hartzler was very successful in growing West Central's agronomy business, although its margins were well-below its industry peers.

**B.    Hartzler Repeatedly Violated West Central's Rules and Policies.**

57. In February 2003, Dale Carlson ("Carlson"), an Iowa farmer, contacted Hartzler. Carlson informed Hartzler that his brother, Darren Hartzler, owed money to Carlson. According to Hartzler, Carlson stated that if he was not paid the amounts owed, he intended to refer the matter to the authorities. Hartzler stole West Central seedcorn and gave it to Carlson in exchange for forgiving his brother's debt.

58. Thereafter, Hartzler annually sold West Central seedcorn to Carlson, for which Carlson provided payments to Hartzler in the form of personal checks made payable to Hartzler or entities associated with Hartzler, which Hartzler kept for his personal benefit. Unbeknownst

to Carlson, Hartzler stole the seedcorn from West Central. Strouburg learned of this practice by at least May 2, 2011. West Central has never accused Carlson of any wrongdoing.

59.     In the spring of 2005, Strouburg and Ahrenholtz learned that Hartzler had used a customer to resell approximately 5,000 bags of seedcorn to another customer that West Central was precluded from selling to directly (*a.k.a.*, "selling sideways"). This practice violated the respective seed manufacturer's agreement with West Central. West Central did not reprimand or terminate Hartzler. Two months later, Hartzler was promoted to Seed Department Manager. Strouburg personally signed the approval form for the promotion.

      **C.    Hartzler is Assigned to the Wollesens' Account and Proceeds to Lie to, and Steal from, Them.**

60.     In late 2005, Jay Sturtz, the agronomist assigned to the Wollesens' account for the period from 2003-late 2005, informed the Wollesens that Hartzler would be taking over the account. Sturtz told the Wollesens that Hartzler had been hired to handle large accounts, and he was empowered "to do things differently."

61.     In the fall of 2005, Hartzler and Bill Wollesen first met to discuss potential business. Hartzler told Bill Wollesen that he had been hired to offer special deals, offer new programs, and do what was necessary to make West Central competitive with other sellers of agronomy products. During that meeting, Hartzler told Bill Wollesen that he received product from manufacturers that he could sell for his own benefit (*a.k.a.* "rep. material"). Bill Wollesen did not doubt the veracity of West Central's Seed Department Manager. During the initial meeting, Hartzler sold what he described as "rep. material" to Iowa Plains Farms, for which Iowa Plains Farms made a $5,000 payment in the form of a check made payable to "Chad Hartzler." Hartzler delivered the product as promised, although unbeknownst to the Wollesens, he stole the product from West Central.

62. Thereafter, in 2006, Hartzler contacted Iowa Plains Farms on multiple occasions. Hartzler indicated that he had "rep. material" that he could sell or otherwise was entitled to receive payment directly. At Hartzler's direction, Iowa Plains Farms made payments directly to Hartzler for materials in the form of checks. Unbeknownst to the Wollesens, Hartzler did not have product that he could sell for his own benefit; he was taking the product from West Central.

63. Thereafter, from 2006 through 2010, Hartzler sold products to Iowa Plains Farms in exchange for checks made payable to Hartzler. During this entire period, the products arrived as Hartzler promised, and no one at West Central indicated to the Wollesens that anything was wrong. Iowa Plains Farms also purchased products from West Central, through Hartzler, during this period of time.

64. There was nothing clandestine about any of the payments that Iowa Plains Farms made to Hartzler. Every payment was made in the form of a documented check. Iowa Plains Farms declared those payments on its tax returns and Farm Service Administration filings. In at least one instance, John Wollesen delivered and left a check made payable to "Chad Hartzler" at West Central's offices, for pick-up by Hartzler.

**D. Direct Payments to Sales Representatives are Common in the Agronomy Industry.**

65. There is nothing unusual about making payments directly to sales representatives, including purchasing agronomy products directly from them, knowing their employer also sells the same products.

66. In the fall of 2005, when Bill Wollesen first met with Hartzler to conduct business, Iowa Plains Farms had purchased millions of dollars of products over more than a decade from Tom Brincks ("Brincks"), a sales employee of Van Diest Supply Company ("Van Diest"), who simultaneously sold the same products for Van Diest and himself. There

was nothing unusual or surprising to Bill Wollesen when Hartzler likewise represented that he possessed products that he could sell for his own benefit. In addition, Iowa Plains Farms had purchased agronomy products directly from several other individuals, knowing they sold the same products for their employers.

67.     Brincks sold millions of dollars of agronomy products to hundreds of people and companies in Iowa over the years preceding Hartzler's introduction to the Wollesens, including cooperatives and other retailers that knew he sold the same products for his employer.

68.     At least two other sales employees of Van Diest also sold agronomy products for their own benefit in competition with Van Diest.

**E.     Gardiner Thomsen Identifies the Lack of Segregation of Duties.**

69.     In 2006, West Central Cooperative and Agriliance LLC formed Westco to house West Central's agronomy business. During the first annual financial audit for Westco, Gardiner Thomsen informed the Audit Committee and Westco's management, including Ahrenholtz, that Westco had significant internal control weaknesses, including a lack of segregation of the duties held by Hartzler, and that such weaknesses could result in theft or misstatement of Westco's financial statements.

70.     West Central, and specifically the Audit Committee, Stroburg and Ahrenholtz, ignored Gardiner's Thomsen's warnings and recommendations.

71.     Thereafter, in each of its annual audits, Gardiner Thomsen repeated its concerns, and West Central, and specifically the members of its Audit Committee, Stroburg, and Ahrenholtz, ignored those warnings and directives.

72.     In 2010, Gardiner Thomsen elevated its concerns related to the lack of internal controls and segregation of duties to a "material weakness", meaning there was a reasonable likelihood that the lack of internal controls and segregation of duties would result in a material

misstatement in the financial statements. Gardiner Thomsen continued to issue unqualified audit opinions for West Central.

**F.     The Audit Committee and Gardiner Thomsen Learn of Hartzler's Widespread Fraudulent Conduct.**

73.     In February 2007, unbeknownst to Iowa Plains Farms, Hartzler was gambling excessively and had incurred substantial losses. Hartzler owed several thousand dollars to Danny Newell, Hartzler's bookie. In February 2007, Hartzler solicited a check in the amount of $46,500 from Iowa Plains Farms, which the Wollesens made payable to "West Central Cooperative" and intended to be applied to Iowa Plains Farms' West Central account. Unbeknownst to the Wollesens, Hartzler instead applied the check to Danny Newell's West Central account, to satisfy gambling debts. West Central learned of this by at least March 30, 2013.

74.     On or about April 20, 2007, West Central Cooperative's board of directors approved Iowa Plains Farms' admission for membership into West Central.

75.     On June 25, 2007, West Central Cooperative issued one share of Class A common stock (Cert. No. 19139) to Iowa Plains Farms.

76.     In December 2007, Tronchetti, who was then a member of the Audit Committee, reported to Mark Gardiner, Ginder and Chesnut that she had received complaints from West Central employees that Hartzler was engaging in fraudulent conduct, including stealing products and services from West Central.

77.     Mark Gardiner understood that the information from Tronchetti identified fraudulent activity by Hartzler, whom Mr. Gardiner knew was a management-level employee with insufficient oversight or internal controls, and whose conduct could have a material effect on the financial statements of West Central. At the Audit Committee's request, Gardiner

Thomsen began conducting a fraud investigation with West Central. Hartzler was not suspended, removed from his position, or otherwise reprimanded. Hartzler's customers, including the Wollesens, were not notified.

78.     On February 1, 2008, West Central issued 20 shares of preferred stock to Iowa Plains Farms.

79.     In 2008, West Central's management issues management representation letters that falsely stated they were not aware of any known or suspected fraud by any management-level employee, and Gardiner Thomsen, knowing of Hartzler's suspected fraud, issued unqualified audit opinions for West Central, based upon management representation letters that falsely stated that West Central was not aware of any known or suspected fraud by any management-level employees. Gardiner Thomsen released them to State and Federal agencies, using the mails and wires. This same illegal practice would continue for each subsequent year.

80.     In December 2008, another West Central employee, Bill Ruzicka ("Ruzicka"), complained to the Audit Committee and other West Central employees that Hartzler was engaging in fraudulent conduct using his accounts.

81.     On late December 2008, at the Audit Committee's request, Ruzicka shared these concerns and beliefs with Mark Gardiner, and he told Mark Gardiner that he had compiled a file that supported his understanding.

82.     By January 2009, Gardiner Thomsen, Tronchetti, Chesnut, Ginder, Coen, Buss and Stroburg had confirmed that Hartzler engaged in several acts of fraud, involving several of his accounts, by virtue of the collective investigation and analysis that they had conducted over the preceding fourteen months. Hartzler was not terminated or removed from his position; his customers were not notified of his malfeasance.

83.     At no point did Gardiner Thomsen disclose to West Central's membership, including the Wollesens, that it knew that Hartzler had engaged in several acts of fraud or that the full extent of his fraud was unknown.  At no point did Gardiner Thomsen withdraw from its auditing services for West Central or issue anything other than unqualified opinions.  Gardiner Thomsen continues to serve as West Central's auditor, and continues to issue "unqualified" opinions that are based, in part, upon prior management representation letters that it knows to be false.

84.     On February 1, 2009, West Central issued 20 shares of preferred stock to Iowa Plains Farms.

85.     Later in 2009, West Central issued management representation letters to Gardiner Thomsen, which falsely stated that they did not know of any known or suspected fraud by members of management or others whose fraud could have a material effect on their financial statements, and Gardiner Thomsen—knowing the management representations were false and therefore could not be relied upon—nonetheless issued unqualified opinions and released West Central's "audited" financial statements to State and Federal agencies through the mail and wires.

86.     On February 1, 2010, West Central Cooperative promoted Hartzler to Director of Seed and Chemical.  That same day, West Central issued 20 shares of preferred stock to Iowa Plains Farms.

G.     **Hartzler's Widespread Efforts to Conceal His Theft from the Wollesens.**

87.     Hartzler concealed his theft from Iowa Plains Farms through a practice commonly known as "lapping."  At the same time Hartzler sold products to Iowa Plains Farms for his personal benefit in 2006 and thereafter, he also booked a receivable for those same products on Iowa Plains Farms' West Central account.  Thus, Iowa Plains Farms was billed twice for the

same products—once by Hartzler and once by West Central. Because Iowa Plains Farms only paid once (to Hartzler), a deficit was created in its account on West Central's books. To hide the deficit, each successive year, Hartzler solicited exponentially larger prepayments from Iowa Plains Farms. While the Wollesens were told and understood that their payments were prepayments for product, Hartzler actually applied them against the deficit that he had created.

88. Hartzler was able to do this by placing Iowa Plains Farms' products in consignment. When a delivered product is placed in consignment, the item does not appear on a monthly statement unless and until the product is billed. This prevented bills from going to Iowa Plains Farms during the year, until Hartzler could solicit the prepayment monies for the following year, which he instead applied to the ever-growing deficit.

89. Because, among other reasons, Iowa Plains Farms was a cash customer that had expressly declined credit privileges, West Central knew there should never have been any consignment or credit balance for Iowa Plains Farms' account at West Central.

90. West Central's policies required that items in consignment be billed within thirty days. Had West Central followed its own policies, it would have discovered Hartzler's improper conduct by at least early as 2009.

91. West Central, and specifically its internal auditor, Thielen, allowed Hartzler to misuse consignment. In early 2009, Thielen was tasked with policing West Central's consignment accounts and making sure the items were billed within thirty days, consistent with West Central's policy. Thielen nonetheless allowed Hartzler to maintain large balances in Iowa Plains Farms' consignment account for several months. Thielen made light of Hartzler's improper conduct in internal correspondence with Hartzler.

92.     Thielen, who previously worked as an outside auditor, knew that an internal auditor is required to be independent from management to properly perform her functions. However, in her role, she reported to Stroburg and placed his interests above those of the company.

93.     From time to time, and despite his efforts, monthly statements were generated for Iowa Plains Farms' account.  Hartzler has testified that in some instances, he directed West Central representatives not to send those monthly statements.  In certain other instances, Hartzler pulled statements out of the process, so they were not mailed.  Despite Hartzler's efforts, there were a few instances where monthly statements were generated, mailed and received by the Wollesens.  In those few instances, the Wollesens called Hartzler, and Hartzler provided Bill Wollesen what Hartzler has described as "persuasive, yet untrue" explanations for the errors.

### H.     Coen, Stroburg, and Ahrenholtz Manipulate Westco's Earnings.

94.     In early 2010, West Central discovered a $3.5 million discrepancy in its agronomy financial statements.

95.     Coen and Stroburg then increased Westco's inventory by $3.5 million, which had the effect of simultaneously increasing Westco's earnings by that same amount.  The adjustment lacked any business justification.  Coen and Stroburg did not inform any other West Central employees or board members that they had made this adjustment to Westco's financial statements.  During the year, business decisions were then made and justified based upon this improperly inflated figure.

96.     In December 2010, Ahrenholtz manipulated Westco's earnings by booking a reserve for fertilizer to artificially inflate Westco's earnings for that month.

I.    **Ahrenholtz Learns of Hartzler's Misuse of Iowa Plains Farms' Consignment Account.**

97.    Ahrenholtz's lack of care allowed Hartzler to defraud and steal from the Wollesens.

98.    Mark Gardiner knew that Ahenholtz was not devoting proper attention to his West Central responsibilities, yet, Gardiner Thomsen did not increase the scope of its audit activities to account for this failure by the only employee who was directly supervising Hartzler, a management-level employee Gardiner Thomsen had identified as lacking adequate segregation of duties or internal controls.

99.    On November 16, 2010, Ahrenholtz learned of the approximately $2 million deficit in Iowa Plains Farms' account that Hartzler had created in Iowa Plains Farms through his improprieties.

100.    Upon information and belief, Ahrenholtz conveyed this information to Stroburg. Neither Ahrenholtz, Stroburg, nor anyone else at West Central contacted the Wollesens about this issue or otherwise alerted them that Hartzler was using Iowa Plains Farms' account in a manner that was inconsistent with the Wollesens' expressed intent.    Hartzler was not reprimanded or removed from the Wollesens' account.

101.    On December 21, 2010, Hartzler was sent to meet with Iowa Plains Farms. During that meeting, Hartzler fraudulently induced Iowa Plains Farms to enter into three prepayment contracts for 2011 inputs, for a total amount of approximately $2.1 million.  Hartzler solicited and collected three checks from Iowa Plains Farms, totaling the same amount.  While those payments were provided as prepayments for Iowa Plains Farms' 2011 inputs, and Hartzler understood Iowa Plains Farms intended for the payments to be prepayments for its 2011 inputs, Hartzler instead applied the amounts to fill the deficit he had created.

### J.    West Central Reverses the Fraudulent $3.5 Million Adjustment.

102.    On January 31, 2011, West Central's fiscal year ended.  Shortly before the end of the fiscal year, West Central reversed the $3.5 million adjustment that Coen and Stroburg had made earlier in the year.  The $3.5 million negative adjustment resulted in Westco having a loss for fiscal-year-ending January 31, 2011, before accounting for any of Hartzler's wrongdoing.

103.    Upon information and belief, the $3.5 million discrepancy relates to bad debts that were assumed by West Central from its purchase of Pelgrow, a cooperative based in Southern Iowa, during 2010.  Upon information and belief, the discrepancy is unrelated to any malfeasance involving Hartzler.

104.    Neither West Central nor Gardiner Thomsen ever undertook steps to determine the extent of Hartzler's fraud or the effects of such fraud on West Central Cooperative or Westco's financial statements for any specific year or cumulatively.

### K.    Hartzler Resigns and the Officers and Directors Use the Lawsuit and Related Publicity to Conceal their Malfeasance.

105.    On April 30, 2011, Hartzler submitted his written resignation, wherein he admitted, "[t]his is all on my hands and my hands alone."

106.    Later on April 30, 2011, the Wollesens threatened litigation against West Central if it did not deliver on the December 21, 2010, prepayment contracts and presented those contracts to Stroburg and other Defendants.  In response, Stroburg replied that West Central had "some internal issues."

107.    Later on April 30, 2011, Stroburg called Hartzler and had a private conversation. Upon information and belief, during that call, Stroburg suggested to Hartzler that he had been bribed and Hartzler agreed to adopt Stroburg's suggestion.

108. On May 2, 2011, Hartzler, who was not represented by counsel, gave a sworn statement to Strouburg and West Central's attorney. Hartzler testified that he went to Iowa Plains Farms in June or July 2006 to collect $20,000 that was owed to West Central for seedbeans that already had been delivered to Iowa Plains Farms. According to Hartzler, during that meeting, Bill Wollesen offered to pay $2,000 cash to Hartzler if he lowered an outstanding bill for seedbeans by $5,000. According to Hartzler, he collected a check from Iowa Plains Farms for the $15,000 amount that was owed after the $5,000 reduction. Hartzler could not explain how he went about lowering the balance owed for seedbean in exchange for the alleged cash payment or why Iowa Plains Farms, a prepay customer, allegedly had any balance owed.

109. The Officers and Directors (other than Chesnut, who was no longer associated with West Central) had duties to confirm Hartzler's explanation before West Central took legal action against the Wollesens or publically accused them of having undertaken illegal or improper conduct.

110. The Officers and Directors (other than Chesnut) did not discharge those duties. A review of West Central's books and records would have demonstrated to the respective Officers and Directors that Hartzler's sworn testimony was demonstrably false.

111. The Officers and Directors nonetheless unanimously voted in their capacities as officers and directors of West Central Cooperative to initiate legal action against Iowa Plains Farms, and, on May 12, 2011, the Lawsuit was filed.

112. West Central knew, at or around the time the Lawsuit was filed, that direct payments to agronomy representatives are not uncommon.

113. West Central claimed in the Lawsuit that the check payments from Iowa Plains Farms to Hartzler were "bribes", provided to Hartzler in exchange for lower prices on products

Iowa Plains Farms purchased from West Central. Despite being inconsistent with its own records, the Verified Petition and Jury Demand, verified by Coen, also repeated Hartzler's false story that Iowa Plains provided a $2,000 cash bribe in "June or July 2006."

114. The Lawsuit was pursued by the respective Officers and Directors to conceal and distract from their malfeasance and prior knowledge of Hartzler's wrongdoing from West Central's members, and to falsely place blame upon the Wollesens.

**L.      The Officers and Directors Retain a Public Relations Firm to Further Conceal Their Malfeasance.**

115. West Central, through the direction and approval of the Officers and Directors, also retained Wixted Pope to serve as its public relations firm. The purpose of Wixted Pope's retention was to create and widely disseminate false and misleading information concerning the Wollesens, for purposes of further concealing the Officers and Directors' malfeasance.

116. Wixted Pope created false and misleading propaganda and widely disseminated such information to media outlets and elsewhere. Wixted Pope and Eileen Wixted, personally, contacted media outlets in Iowa and elsewhere and provided false explanation of events that Stroburg and the directors had fabricated, and Wixted Pope took further steps to ensure that those stories remained available and published on an ongoing basis through search engines such as "Google."

117. As a result of Wixted Pope's actions, it was widely reported and accepted as true that "Hartzler took $480,000 in bribes from Bill Wollesen."

118. Wixted Pope and Eileen Wixted knew that West Central's "bribe story" was false, and they owed duties to determine the veracity of the story that they were widely disseminating before doing so.

119.    Wixted Pope was retained by West Central to act on its behalf. Stroburg's and the remaining Officers and Directors' interests were in conflict with those of West Central. Wixted Pope and Eileen Wixted knowingly advised and assisted Stroburg in taking steps that were inconsistent with West Central's interests, but rather benefited Stroburg's personal interests. By way of example and without limitation, Wixted Pope advised Stroburg that he should not terminated Akrenholtz, despite Ahrenholtz's malfeasance, because doing so would also reveal Stroburg's malfeasance and lack of care.

**M.    Stroburg Uses Town Hall Meetings to Further Disseminate His False Story.**

120.    In May 2011, following the filing of the Lawsuit, Stroburg personally attended and spoke at eight town hall meetings, where he repeated unlawful and misleading information prepared by Wixted Pope for purposes of his use at those meetings.

121.    The purpose of the information provided by Stroburg at those meetings was not to accurately inform West Central's members of what Hartzler did and how he was allowed to do it, but rather to mislead the members of West Central so that the Officers and Directors would not be removed from their positions based on their acts of malfeasance.

**N.    Gardiner Thomsen, West Central and Other Defendants Use Hartzler's Theft to Conceal Unrelated Losses.**

122.    Gardiner Thomsen, and specifically Mark Gardiner, cooperated and participated in the decisions concerning the adjustments that would be made to West Central's financial statements following Hartzler's resignation.

123.    West Central recorded a $2.3 million loss for Hartzler's theft.

124.    Stroburg, Gardiner Thomsen, Coen, Weigel and others knowingly, intentionally and falsely associated an additional approximately $5.5 million in losses with Hartzler and Iowa Plains Farms.

125.    Mark Gardiner, along with Stroburg, Weigel and others decided to book losses that were unrelated to Hartzler's fraud, and in some instances not warranted, for purposes of using Hartzler's admitted theft to conceal losses that were unrelated to his conduct, including the $3.5 million amount discussed *supra*.  The losses were also intended to, and did, have the effect of improperly increasing future years' agronomy earnings.  As a result, West Central booked losses totaling exceeding $7.5 million, when the extent of Hartzler's theft was actually approximately $2.3 million.

126.    Immediately after assisting and coordinating the West Central representatives to make the accounting entries reflected in the prior paragraph, Gardiner Thomsen then audited those entries, supposedly as an "independent" auditor.

127.    The fraudulent and incorrect accounting entries identified in the preceding two paragraphs have affected and continue to affect subsequent financial statements, which are transmitted through the mail and wires to State and Federal agencies.

128.    Stroburg falsely reported at town hall meetings that the losses from the alleged conspiracy between Hartzler and the Wollesens totaled $7.8 million.

129.    On June 23, 2011, West Central held its annual meeting for its members.  Stroburg again falsely reported to West Central's membership that West Central's losses from Hartzler's theft totaled over $7 million.

**O.    The Unlawful Lien**

130.    After Hartzler's April 30, 2011 resignation, West Central refused to deliver any more products to Iowa Plains Farms, including products that it had prepaid in December 2010 for its 2011 crops.  Iowa Plains Farms' 2011 crops were the product of supplies obtained from sources other than West Central.

131.    In September 2011, West Central filed a lien against Iowa Plains Farms' 2011 crops.

132.    Iowa Plains Farms had prepaid for its 2011 inputs.

133.    Iowa Plains Farms had not executed a UCC-1 statement in favor of West Central, or otherwise authorized any such lien.

134.    There was no basis for West Central to file a lien against Iowa Plains Farms' 2011 crops.

135.    Iowa Plains Farms' bank, which provided a revolving line of credit for its operations, had already properly created and perfected a first-priority lien in Iowa Plains Farms' 2011 crops, the proceeds of which totaled $1.57 million.

136.    Iowa Plains Farms challenged the validity of this improper and unlawful lien, and West Central improperly used the judicial process to delay the inevitable outcome that the lien would be ruled unlawful and set aside.  West Central also included a cause of action in the Lawsuit related to its improper lien and seeking the foreclosure of the improper lien.

137.    West Central fully-exhausted the judicial process until it was resolved until 2014.

138.    West Central's position had no legal basis, and it was motivated to force the Wollesens to incur substantial financial harm.  The Officers and Directors hoped to bankrupt the Wollesens, so they would not be financially able to defend themselves from the baseless allegations in the Lawsuit.

139.    West Central, by and through its outside attorneys, contacted the third-party, DFS, Inc., ("DFS") to which Iowa Plains Farms sold its 2011 grain, and West Central directed DFS to issue the check for Iowa Plains Farm's grain to both "Iowa Plains Farms" and "West Central

Cooperative." West Central Cooperative then refused to endorse the checks, thereby depriving Iowa Plains Farms from the proceeds of its 2011 crops for more than two years.

      **P.**      **West Central and Gardiner Thomsen Submit Improperly Audited Financial Statements to State and Federal Agencies.**

140. West Central's consolidated audit report for the fiscal year ending January 31, 2011 was due to the Iowa Department of Agriculture Grain Warehouse Bureau and the United States Department of Agriculture Farm Service Agency by no later than May 31, 2011.

141. West Central asked Gardiner Thomsen to release West Central's financial statements on May 27, 2011, in order to comply with its reporting deadline.

142. At the time Gardiner Thomsen released West Central's audited financial statements, West Central had not provided any management representation letter to Gardiner Thomsen, as required for financial statements to be audited in conformity with GAAP.

143. Because obtaining the written representations of management is a requirement of GAAP, and because those representations had not been made by West Central's management as of the date of the auditors' report, the financial statements submitted to the State and Federal governments were not "audited in accordance with auditing standards generally accepted in the United States of America", as (i) asserted in the Independent Auditors Report of Gardiner Thomsen, P.C., which accompanied the financial statements, and (ii) required under applicable law.

144. Gardiner Thomsen released the financial statements and its "unqualified" audit opinion to State and Federal agencies, knowing: (i) it did not have a management representation letter, as was required for its opinion, and (ii) that management had falsely represented for several years that it was not aware of any suspected or known fraud by management-level

employees. While unlawful and improper, Gardiner Thomsen released the financial statements, because it would have been detrimental to West Central if it did not do so, and Gardiner Thomsen knew that would adversely affect its professional relationship with West Central and other cooperatives.

145. On July 18, 2011, Stroburg, Coen and Buss signed a management representation letter for the 2011 financial statements.

146. West Central's July 18, 2011 management representation letter was improperly back-dated to May 27, 2011 by the three individuals identified in the preceding paragraph.

147. West Central's management representation letter did not exist on the date that the "Independent Auditors' Report" was issued by Gardiner Thomsen.

148. The Independent Auditors' Report was improperly dated and should bear the date of July 18, 2011, and it should not have been released to State and Federal agencies.

149. Gardiner Thomsen did not have sufficient audit evidence to support its Independent Auditors' Report dated May 27, 2011, without West Central's fully executed management representation letter in hand.

150. Gardiner Thomsen was required to do additional audit services as a result of Hartzler's fraud, yet it failed to do so.

151. It was improper and unlawful for West Central to back-date the management representation letter, and it was improper and unlawful for Gardiner Thomsen to rely upon the management representation letter that did not exist.

152. The "May 27, 2011" management representation letter that West Central's management eventually issued to Gardiner Thomsen also falsely stated that West Central's management, "ha[d] made you fully aware of the fraud perpetrated by an employee, resulting in

a petition having been filed against such employee and others in Story County." Gardiner Thomsen knew that West Central had not made it fully aware of such fraud, and it failed to perform additional professional work to identify the scope of such fraud or how it affected any individual year's audit.

153.    In August 2014, the Wollesens wrote to the Officers and Directors (other than Coen and Chesnut) and demanded that they withdraw the improperly filed financial statements. In August 2015, the Wollesens wrote to Gardiner Thomsen and demanded that it immediately withdraw improperly filed audit opinions from State and Federal records. Both requests have been denied.

154.    Gardiner Thomsen continues to serve as West Central's auditor, and it continues to issue audit opinions that are based, in part, on its prior improper audits.

**R.     Hartzler Changes His Story.**

155.    West Central, through the Officers and Directors, had confirmed the falsity of Hartzler's May 2011 "bribe story" by at least February 2012, when it removed its previous allegation that a cash bribe occurred in "June or July 2006."

156.    On March 28 and 29, 2013, the Wollesens' counsel deposed Hartzler for the Lawsuit. Hartzler confirmed that he no longer alleged that he received a cash payment from the Wollesens in 2006, and he also testified that direct payments to sales representatives are "probably common" in the agronomy business. Hartzler testified that "I never said—that was never my word, 'bribe'…"

157.    During his March 2013 deposition, Hartzler testified that a cash payment was given to him by Bill Wollesen in June 20<u>05</u>, rather than June or July 20<u>06</u>. Hartzler again testified that the alleged bribe was to reduce a bill outstanding for seed<u>bean</u>. According to

Hartzler, the alleged $2,000 cash payment was to lower the price Iowa Plains Farms paid for its 2005 seedbean from $23/bag to $17/bag.

158.    Hartzler's revised story is demonstrably false.  Among other reasons, Iowa Plains Farms prepaid for its seedbean at $17.50/bag in January 2005, and it still had a prepay balance into and through June 2005.  This information was reflected in West Central's records.

**S.     West Central Rejects Hartzler's Demonstrably-False Explanation.**

159.    Because both of Hartzler's "stories" are false, West Central rejected both of Hartzler's alleged "bribe stories" at trial in the Lawsuit.  West Central instead presented a different, yet likewise demonstrably-false, explanation of the alleged bribe.

160.    West Central and the Officers and Directors (other than Chesnut) continued to pursue the Lawsuit, despite knowing that: (a) both of its chief witness' alleged explanations of a cash payment were demonstrably false, and (b) according to their chief witness, cash payments to agronomy representatives such as those solicited by Hartzler from the Wollesens are "probably common."

161.    Upon information and belief, West Central has spent more than $6 million to pursue the Lawsuit against the Wollesens, a patently unreasonable amount, requiring the Wollesens to incur millions of dollars of legal fees and costs.  West Central spent this amount at the direction of the Officers and Directors, because they were using the Lawsuit for improper purposes.

**T.     West Central's Unlawful Expulsion of Iowa Plains Farms.**

162.    Trial in the Lawsuit originally was scheduled to commence late June 2013.

163.    On June 6, 2013, Stroburg sent a certified letter to Iowa Plains Farms, wherein Stroburg explained that "at the West Central Cooperative Board meeting held on May 21, 2013,

the directors unanimously determined that Iowa Plains Farms should be expelled from membership in West Central Cooperative, and its common stock cancelled."

164.    Chapter 499.18 of the Iowa Code provides that a cooperative may expel a member "if the member … has willfully violated any article or bylaw which provides for such penalty."

165.    West Central Cooperative's Amended Articles of Incorporation, as amended, provide that "[t]he directors may expel any member who has willfully violated any article or bylaw which provides for such penalty."

166.    Iowa Plains Farms has never willfully violated any article or bylaw providing for expulsion from West Central.

167.    West Central's expulsion was taken solely for tactical reasons in the Lawsuit, which itself was pursued by West Central and the Officers and Directors for improper reasons in conflict with the Officers and Directors' duties to West Central.

168.    Stroburg testified at trial for the Lawsuit, and West Central's counsel stated in closing arguments for trial in the Lawsuit that Iowa Plains Farms was the only member to have been expelled.  Danny Newell remains a member of West Central.

**U.      The Jury Rightfully Exonerates the Wollesens.**

169.    The trial in the Lawsuit began on July 8, 2014, and it concluded on August 5, 2014.  On August 7, 2014, the jury reached its verdict through special interrogatories, and it concluded that the Wollesens did not: (i) provide a $2,000 bribe to Hartzler; (ii) engage in any conduct that they knew or had reason to know violated Hartzler's duties to West Central; (iii) engage in any unlawful or improper conduct; and/or (iv) engage in any willful conduct directed towards West Central.  The jury instead awarded Iowa Plains Farms $576,189 in damages on its counterclaims for breach of contract and fraud related to the products that West Central refused to deliver in 2011 after Hartzler's resignation.

170.     The Wollesens subsequently demanded that the respective Officers and Directors reinstate Iowa Plains Farms as a member in West Central Cooperative and reimburse them for lost amounts during the period of improper exclusion.  The Officers and Directors have refused these requests.

**V.       Stroburg's Resignation.**

171.     In the fall of the 2014, the Officers and Directors (other than Stroburg, Chesnut and Coen) forced Stroburg to resign from West Central.

172.     The Officers and Directors, through West Central's Director of Communications, Alicia Clancy, and for purposes of further concealing their and Stroburg's malfeasance, falsely announced publicly and disseminated through news outlets that Stroburg had "retired."

**W.      West Central Continues to Disseminate False and Misleading Information.**

173.     West Central and its agents continue to state false and misleading information concerning the Wollesens.  For example and without limitation, at West Central's 2015 annual meeting, Milan Kucerak, the current CEO of West Central, referred to Bill Wollesen as a "crook" and falsely stated that he had conspired with Hartzler to defraud West Central.

**COUNT I**
**MALICIOUS PROSECUTION**

174.     The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 173 as though set forth in their entirety.

175.     This Count is brought by the Wollesens against the Defendants (other than Chesnut, Gardiner Thomsen, P.C., and Daniel Mark Gardiner).

176.     The Lawsuit was not based upon probable cause.

177.     The Lawsuit was brought for improper motives and with malice by the respective Defendants.

178.    The respective Defendants knew there was no probable cause, and that the Lawsuit was being pursued against the Wollesens for improper purposes.

179.    The respective Officers and Directors authorized the Lawsuit and caused it to be filed and continued for their personal benefits, to the detriment of the Wollesens.

180.    While the Lawsuit was brought in the name of Westco, it was authorized by the respective Officers and Directors in their capacities as directors of West Central Cooperative, and undertaken on its behalf.

181.    West Central Cooperative was the appropriate party for any such claims that were pursued in the Lawsuit, and the Officers and Directors approved the Lawsuit in their capacity as officers and directors of West Central Cooperative.

182.    Since the lawsuit was filed, West Central has dissolved Westco.

183.    If necessary, the Wollesens are entitled to pierce the corporate veil to assert any claims for malicious prosecution otherwise attributable to Westco against West Central Cooperative.

184.    The improperly filed lien was undertaken for improper purposes, without probably cause, and with malice against Iowa Plains Farms.

185.    The improperly filed and pursued Lawsuit, including the unlawful lien asserted therein, resulted in millions of dollars of special and other damages to the Wollesens.

### COUNT II
### UNLAWFUL EXPULSION & UNLAWFUL REFUSAL TO REINSTATE

186.    The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 185 as though set forth in their entirety.

187.    This count is brought by Iowa Plains Farms against West Central Cooperative, Farmers Cooperative Company, and the Offices and Directors (other than Chesnut).

188.     Iowa Plains Farms could only be expelled from West Central Cooperative upon a proper determination that willfully undertook certain specified improper actions.

189.     Iowa Plains Farms did not willfully undertake any such improper actions, and the respective Officers and Directors knew, or should have known, that Iowa Plains Farms had not undertaken any such actions when they voted to expel Iowa Plains Farms.

190.     The purpose of Iowa Plains Farms' expulsion was to aid trial strategy for the improperly pursued Lawsuit.

191.     At a minimum, the respective Officers and Directors were required to wait to the pendency of trial in the Lawsuit to undertake any such action.

192.     The respective Officers and Directors also deprived the Wollesens of adequate due process before making their improper decision to expel Iowa Plains Farms.

193.     The expulsion and cancellation of Iowa Plains Farms' stock was unlawful and improper, and it violated the written agreement between West Central Cooperative and Iowa Plains Farms, as reflected in West Central Cooperatives' bylaws.

194.     As a result of West Central Cooperative's cancellation of Iowa Plains Farms' stock, Iowa Plains Farms' reasonable expectation to receive fair value for its shares and distributions therefrom has been denied, without justification.

195.     Following the Jury's determination in the Lawsuit, the respective Defendants were required to reinstate Iowa Plains Farms.

196.     West Central, through the respective Officers and Directors, has refused to reinstate Iowa Plains Farms or provide them with the dividends and other amounts owed for the period of unlawful expulsion.

197.     The expulsion of Iowa Plains Farms was *ultra vires* and has no legal effect.

198.     In addition to damages, Iowa Plains Farms requests preliminary and permanent injunctive relief that the unlawful expulsion had no effect, and that Iowa Plains has been a member of West Central at all times since April 2007, or, in the alternative, immediately reinstating Iowa Plains Farms as a member and shareholder of West Central Cooperative (or Farmers Cooperative Company, to the extent West Central Cooperative has merged into Farmers Cooperative Company at the time such determination is made).

## COUNT III
## BREACH OF FIDUCIARY AND OTHER DUTIES

199.     The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 198 as though set forth in their entirety.

200.     This Count is brought by Iowa Plains Farms against the Officers and Directors, Gardiner Thomsen, and Wixted Pope.

201.     Each of the Officers and Directors owed fiduciary duties of care, good faith, and loyalty to West Central Cooperative and Westco, and each of the Officers also owed duties of loyalty to West Central Cooperative and Westco.

202.     Each of the Officers and Directors breached the duties of care, loyalty and good faith that they owed to West Central Cooperative and Westco.

203.     Gardiner Thomsen and Wixted Pope aided and abetted and conspired with the Officers and Directors to breach fiduciary duties and other duties owed by the Officers and Directors to West Central Cooperative and Westco.

204.     The respective Defendants breaches of their fiduciary duties resulted in millions of dollars of damages to the Wollesens.

205. The damages suffered by Iowa Plains Farms from the above-referenced breaches of the fiduciary duties were unique to Iowa Plains Farms and not incurred by other members of West Central Cooperative.

206. Iowa Plains Farms contacted the Officers and Directors and demanded to be reimbursement for damages incurred. The Officers and Directors have refused.

## COUNT IV
## ABUSE OF PROCESS

207. The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 206 as though set forth in their entirety.

208. This Count is brought by the Wollesens against West Central Cooperative, Westco, and Farmers Cooperative Company.

209. Through the Lawsuit, West Central and Westco has and continues to use the legal process in an improper or unauthorized manner, and the Wollesens have suffered millions of dollars of damages as a result of the abuse.

210. West Central Cooperative filed an improper lien on Iowa Plains Farms' 2011 crops.

211. There was no legal basis under existing Iowa law, or any reasonable expansion of Iowa law, to file the improper lien.

212. West Central and it counsel knew West Central had no legal basis for filing the improper lien.

213. West Central filed the lien with improper motives, specifically to inflict financial harm on Iowa Plains Farms. West Central and it counsel then used the legal process, including numerous filings in Iowa courts, wherein it made meritless arguments that had no legal basis, all

so it could delay the inevitable outcome that the improper lien would be removed and the subject funds released.

214.    The use of legal process was improper and unauthorized.

215.    Iowa Plains Farms incurred substantial damages as a result of West Central Cooperative's abuse of process, including, but not limited to, financial damages, attorneys' fees that are unique and identifiable from the other aspects of the Lawsuit, and sever emotional harm.

### COUNT V
### TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONSHIPS

216.    The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 215 as though set forth in their entirety.

217.    This Count is brought by Iowa Plains Farms against West Central Cooperative, Farmers Cooperative Company, and Wixted Pope.

218.    West Central Cooperative knew of existing contracts and potential business relationships between Iowa Plains Farms and third parties.

219.    West Central Cooperative intended to and did, improperly and intentionally, interfere with certain of Iowa Plains Farms' existing contracts and prospective business relationships.

220.    West Central Cooperative's improper interference caused existing contracts and prospective business relationships to fail.

221.    Wixted Pope knowingly aided and abetted West Central Cooperative's tortious interference.

222.    Iowa Plains Farms was damaged as a result of the improper conduct alleged in this Count.

## COUNT VI
## BREACH OF FIDUCIARY AND OTHER DUTIES – GARDINER THOMSEN AND WIXTED POPE

223.    The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 222 as though set forth in their entirety.

224.    This Count is brought by Iowa Plains Farms against Wixted Pope and Gardiner Thomsen.

225.    Wixted Pope owed fiduciary duties and duties of good faith and loyalty to West Central Cooperative and Westco.

226.    Wixted Pope breached fiduciary duties and duties of good faith and loyalty that it owed to West Central Cooperative and Westco.

227.    Gardiner Thomsen owed fiduciary duties and other duties of good faith and loyalty to West Central Cooperative and Westco.

228.    Gardiner Thomsen breached fiduciary duties and duties of good faith and loyalty that it owed to West Central Cooperative and Westco.

229.    These breaches of fiduciary and other duties that are the subject of this Count resulted in specific and direct harm to Iowa Plains Farms.

230.    The Wollesens suffered damages that are unique, separate and distinct from those suffered by West Central or its other members as a result of Gardiner Thomsen's and Wixted Pope's breaches of fiduciary and other duties.

231.    Iowa Plains Farm suffered millions of dollars of damages as a result of the allegations in this Count.

## COUNT VII
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

232.    The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 231 as though set forth in their entirety.

233.    This claim is asserted against Gardiner Thomsen, P.C., Mark Gardiner, Weigel, Coen, Stroburg, Buss, Ahrenholtz, Tronchetti, Ginder, and Chesnut.

234.    The claim of federal RICO violation identified in this Count arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.

235.    At all times relevant to this Complaint, Gardiner Thomsen, P.C., including agents and employees of Gardiner Thomsen, P.C., Mark Gardiner and Weigel, and West Central Cooperative, including Coen, Stroburg, Buss Tronchetti, Ginder, Chesnut and Weigel (collectively, the "Participants"), constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that is, a group of business entities or individuals associated in fact, which was engaged in, and the activities of which affected, interstate commerce and foreign commerce for unlawful purposes.

236.    The pattern of racketeering engaged in by the Participants involved the previously alleged and related illegal schemes, carried out from at least May 2008 to the present, and directed at and otherwise affecting the Wollesens, among others.  Such pattern of racketeering includes, among other things: (i) the knowing creation and issuance of fraudulent financial statements to State and Federal agencies using the mails and/or wires, (ii) the knowing recordation of fraudulent financial entries, for purposes of concealing losses unrelated to Hartzler, (iii) the knowing creation and issuance of financial statements to State and Federal agencies, knowing that such financial statements were not audited in conformity with GAAP.

237.    The subject Defendants participated in the operation and management of the subject enterprise.

238.    By way of example and without limitation, Gardiner Thomsen participated in the operation and management of the subject enterprise by, among other things: (i) identifying and causing fraudulent accounting entries to be made following Hartzler's resignation in May 2011, for purposes of improperly concealing unrelated losses, (ii) undertaking a concurrent fraud investigation alongside the Defendant representatives of West Central, which confirmed fraudulent conduct by Hartzler by at least January 12, 2009; (iii) knowingly taking intentional and affirmative steps to conceal Hartzler's confirmed theft, including, by way of example and without limitation, the issuance of unqualified audit opinions on or about May 20,2008, May 29, 2009, April 30, 2010, May 27, 2011, May 10, 2012, that were based upon management representation letters that Gardiner Thomsen knew were false or had not been issued, and then used the mails and/or wires to submit such false financial statements across state lines.

239.    By way of example and without limitation, the subject individual Defendants identified in this Count participated in the operation and management of the subject enterprise by, among other things: (i) falsifying business records of West Central on or about May 30,2008, May 29, 2009, April 30, 2010, July 18, 2011, and May 10, 2012, to falsely state that West Central and its management was not aware of any employee with management-level responsibility had undertaking suspected or confirmed fraud, (ii) backdating business records to conceal malfeasance, and (iii) creating false accounting entries for purposes of improperly concealing management's malfeasance in May 2011.

240.     In addition to any legitimate transactions, the course of conduct of this enterprise included preparing false business records and submitting false business records to State and Federal agencies outside the State of Iowa by use of the mails and wires.

241.     The individual Defendants undertook the specific unlawful conduct for purposes of concealing their own malfeasance.   Gardiner Thomsen undertook the specific unlawful conduct for purposes of collecting fees from West Central and its other clients in the agronomy industry.

242.     The Participants knowingly and willfully associated with the association-in-fact enterprise and conducted and participated in the conduct of the enterprise's affairs, directly and indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

243.     The pattern of racketeering continues.

244.     The pattern of racketeering engaged in by the Participants involved the previously alleged predicate acts consisting of mail fraud and wire fraud, as defined in 18 U.S.C. § 1961(1)(A) and/or (B) The predicate acts also include felony state-law felonies, including the falsification of business records.

245.     The illegal enterprise is ongoing.   Gardiner Thomsen has and continues to participate in the unlawful enterprise in exchange for payments, and its knowledge that if it did not participate in the unlawful enterprise, it would no longer receive such fees from West Central and other clients.   The remaining Defendants engaged and/or continue to engage in such conduct for purposes of retaining their employment.

246.     The Wollesens have been injured and damaged by reason of Defendants' ongoing participation in the unlawful enterprise, including, but not limited to: millions of dollars of damages for prepayments for which products have not been delivered, millions of dollars of

damages for lost revenues and income on account of the dissemination of false and misleading information, and millions of dollars of damages in legal fees incurred.

247.    The Wollesens seek all damages available at law, including treble damages, attorneys' fees and other costs incurred to investigate and pursue this action, and appropriate injunctive relief.

**COUNT VIII**
**ONGOING CRIMINAL CONDUCT, IOWA CODE CHAPTER 706A**

248.    The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 247 as though set forth in their entirety.

249.    This Count is brought against Gardiner Thomsen, P.C., Mark Gardiner, West Central Cooperative, Coen, Buss, Stroburg, Ginder, Tronchetti, and Chesnut.

250.    Coen, Buss, and Stroburg did, for a period of several years, signed management representation letters that they knew were false.

251.    Gardiner Thomsen has for a period of at least seven years, and continues to, annually issue improper audit opinions and submit those unlawful audit opinions with State and Federal agencies using the mails and/or wires.

252.    Ginder, Tronchetti and Chesnut knew that such representations were false, and they knowingly conspired with and aided and abetted the unlawful conduct of the other Defendants identified in this Count.

253.    Iowa Code 706A.2.4 provides that it "is unlawful for a person to commit specified unlawful activity as defined in section 706A.1."

254.    Iowa Code 706A.1.5 provided that "'Specified unlawful activity' means any act, including any preparatory or completed offense, committed for financial gain on a continuing

basis, that is punishable as an indictable offense under the laws of the state in which it occurred and under the laws of this state."

255.    Iowa Code §714.8 makes it a felony to, among other things, "[m]ake[] any entry in or alteration of any public records, or any records of any corporation, partnership, or other business enterprise or nonprofit enterprise, knowing the same to be false."

256.    Iowa Code §715A.2(b) makes it a felony to, "[m]ake[], complete[], execute[], authenticate[], issue[], or transfer[] a writing so that it purports to be the act of another who did not authorize that act, or so that it purports to have been executed at a time or place or in a numbered sequence other than was in fact the case, or so that it purports to be a copy of an original when no such original existed."

257.    Gardiner Thomsen has engaged in violations of Iowa Code 706A.1 and Iowa Code 706A.2 by engaging in ongoing acts that are indictable under Iowa law, including, among other things, engaging in ongoing felonious "fraudulent practices" and illegal forgery. *See* Iowa Code §714.8.4; §715A.2(1)(b).

258.    Gardiner Thomsen, P.C. also violated Iowa Code 706A.2(5) by negligently empowering Mark Gardiner to facilitate specified unlawful activity, including, but not limited to ongoing felonious fraudulent practices.

259.    The Wollesens have been damaged and injured as a result of Gardiner Thomsen's specified unlawful activity on an ongoing basis, including its repeated preparation of fraudulent business records and submission of false business records to State and Federal agencies.

260.    The Wollesens are entitled to recover three-fold their actual damages, and the cost and expenses of investigation and prosecution of this action, including reasonable attorneys fees and costs pursuant to Iowa Code Section 706.3(7), and all equitable relief as allowed under Iowa

Code 706A, including injunctive relief requiring Gardiner Thomsen to withdraw its unlawful audit opinions from State and Federal agencies.

261.     Upon filing, a copy of the filed petition will be submitted promptly via certified mail to the Iowa Attorney General, as required under Iowa 706A.3.10.

## COUNT IX
## FRAUDULENT MISREPRESENTATION

262.     The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 260 as though set forth in their entirety.

263.     This Count is brought by the Wollesens against Gardiner Thomsen.

264.     For the entire period of time at issue, Gardiner Thomsen has known that its audited financial statements were used by West Central annually for purposes of its grain licensure; that West Central annually reported to its members that it obtained audited financial statements; and that West Central annually notified its members that it had obtained unqualified audit opinions.

265.     Gardiner Thomsen was aware that West Central's audited financial statements were used by West Central for purposes of its grain licensure.

266.     Gardiner Thomsen knew and foresaw that its unqualified audit opinions would be relied upon by the Wollesens.

267.     The Wollesens were members of classes for which the subject "audited" financial statements were intended to benefit.

268.     West Central and Gardiner Thomsen knew that West Central's members, including the Wollesens, relied upon Gardiner Thomsen's unqualified audit opinions.

269.     The Wollesens were aware that West Central received audited financial statements each year and the audit opinions were unqualified.

270.    The Wollesens relied on Gardiner Thomsen's unqualified audit opinions in electing to conduct business with West Central, including the purchases they made through Hartzler.

271.    The Wollesens reasonably relied upon the fraudulent misrepresentations made by Gardiner Thomsen in its audit opinions for West Central during the subject years, and specifically its "unqualified" opinions.

272.    Had Gardiner Thomsen's and West Central's knowledge of Hartzler's fraud been disclosed; had Gardiner Thomsen failed to issue an unqualified opinion based upon the management representation letters that it knew were false; and/or had Gardiner Thomsen withdrawn from its role as auditor, then the Wollesens would have ceased their business conduct with or through Hartzler.

273.    In each of its audit opinions, Gardiner Thomsen provided an unqualified audit opinion, and it represented and warranted that such opinion was based upon an audit of West Centrals' respective entities in compliance with GAAP.

274.    In fact, Gardiner Thomsen knew that for each audit that it conducted for West Central for the fiscal years-ending in 2008-2011, such audits were not undertaken in compliance with GAAP, and its opinions were improperly based upon fraudulent management representation letters.

275.    Gardiner Thomsen was aware, or should have been aware, that its fraud investigation services concerning Hartzler would directly impact and affect the Wollesens.

276.    The Wollesens have incurred millions of dollars in damages as a result of the fraudulent misrepresentations and negligence that are the subject of this Count.

## COUNT X
## PROFESSIONAL NEGLIGENCE

277.    The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 275 as though set forth in their entirety.

278.    This Count is brought by the Wollesens against Gardiner Thomsen.

279.    Gardiner Thomsen had a duty to undertake its services, including its attestation work and fraud investigation, in a manner consistent with prevailing professional standards and rules.

280.    Gardiner Thomsen did not perform its work in a manner that satisfies accepted professional standards.

281.    Gardiner Thomsen's attestation and fraud investigation services were performed negligently.

282.    Gardiner Thomsen failure to satisfy accepted professional standards was willful and wanton.

283.    The Wollesens were in a class of persons known to use and rely upon Gardiner Thomsen's audits for West Central and its separate fraud investigation services.

284.    The Wollesens were aware of Gardiner Thomsen's attestation services and relied upon its annual, unqualified opinions during the period of time at issue.

285.    If Gardiner Thomsen had performed its audit and fraud investigation in a manner that was consistent with accepted professional standards, the Wollesens would have learned of Hartzler's fraudulent conduct and would have ceased doing business with Hartzler immediately.

286.    The Wollesens were harmed as a result of Gardiner Thomsen's professional negligence in a way that was unique and separate from other members of West Central.

## COUNT XI
## DEFAMATION

287.     The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 285 as though set forth in their entirety.

288.     This count is brought against Wixted Pope, West Central Cooperative and Milan Kocerak.

289.     Wixted Pope made false and misleading statements concerning the Wollesens, including untrue statements of fact that they had engaged in felonious acts and other acts of moral turpitude.

290.     Wixted Pope published those statements to others, including employees of West Central and media outlets, for the specific purpose of having those false and misleading statements further disseminated.

291.     Wixted Pope and its principals knew the profound effects that the dissemination of information through the media would have.

292.     Wixted Pope's false and misleading statements continued to be published after the initial date they were made.

293.     Upon information and belief, Wixted Pope paid to sponsor content, so that news articles that were published at Wixted Pope's direction, which included false and untrue statements of fact concerning felonious acts by the Wollesens, would remain online and receive preference in google searches.

294.     Despite the Jury's confirmation in August 2014 that those statements of felonious acts were untrue, Wixted Pope has taken to no steps to retract its prior statements or cause the media outlets that it directed to repeat its false and untrue statements to retract their untrue statements.

295. The publication of false and untrue statements by Wixted Pope for specific purpose that they be further disseminated by others has, and continues to cause the Wollesens substantial financial harm.

296. West Central, through Milan Kucerak and others, has made and published false and misleading statements concerning Bill Wollesen and the Wollesens, including calling them "crooks" and otherwise stating and implying that they have engaged in criminal conduct.

297. The Wollesens have incurred substantial financial and other damages as a result of the defamatory statements of fact described herein.

## COUNT XII
## PUNITIVE DAMAGES

298. The Wollesens incorporate herein by reference the allegations contained in paragraphs 1 through 296 as though set forth in their entirety. The conduct of each of the Defendants was committed in willful and wanton disregard for the rights of the Wollesens. The conduct of the Defendants was directed specifically at the Wollesens. The Wollesens are entitled to punitive damages for Defendants' conduct.

## JURY DEMAND

The Wollesens demand a trial by jury.

## REQUESTED RELIEF

WHEREFORE, the Wollesens respectfully prays that judgment be entered against Defendants and the following relief be entered against Defendants in favor or the Wollesens:

A. All monetary damages available, including all direct, indirect, special and other damages available at law or otherwise, in an amount exceeding $6 million;

B. Damages for emotional distress and other emotional harm;

C.      Declaratory judgment that Iowa Plains Farms' expulsion from West Central Cooperative was unlawful and void and temporary and permanent injunctive relief, reinstating Iowa Plains Farms as a member of West Central Cooperative and payment of all dividends and other amounts owing to Iowa Pains Farms for the period West Central unlawfully expelled Iowa Plains Farms, and other damages incurred as a result of the unlawful expulsion;

D.      Temporary and permanent injunctive relief allowing Iowa Plains Farms to vote on West Central Cooperative's anticipated merger with Farmers Cooperative and an opportunity to attend and speak to West Central's members;

D.      A determination that the December 18, 2015 vote was based upon insufficient information having been provided to the members of West Central Cooperative by the current Officers and Directors, and an order determining the vote of such members is null and void and enjoining the pending merger unless and until a proper, informed vote has been undertaken;

E.      Attorneys' fees and other costs incurred to investigate and pursue this action;

F.      Treble damages and punitive damages;

G.      Immediate and permanent injunctive relief requiring West Central and Gardiner Thomsen to immediately withdraw financial statements that were improperly filed with any state or federal agency;

H.      Prejudgment interest; and

I.      Such other and further legal or equitable relief that may be available and appropriate.

Respectfully Submitted,

HEIDMAN LAW FIRM, L.L.P.

BY:    */s/ Jeff W. Wright*
       JEFF W. WRIGHT, AT0008716
       JOEL D. VOS, AT0008263
       1128 Historic 4th Street
       P.O. Box 3086
       Sioux City, Iowa 51102
       Phone: (712) 255-8838
       Fax: (712) 258-6714
       E-Mail: Jeff.Wright@heidmanlaw.com
       E-Mail: Joel.Vos@heidmanlaw.com


By:    */s/ Samuel L. Blatnick*
       Samuel L. Blatnick           AT0011632
       KUTAK ROCK LLP
       Two Pershing Square
       2300 Main Street, Suite 800
       Kansas City, MO 64108
       Telephone: (816) 502-4603
       Facsimile: (816) 960-0041
       E-mail: samuel.blatnick@kutakrock.com

       **ATTORNEYS FOR PLAINTIFFS**